| | | |
|---|---|---|
| HA THI LE, HA THI LLC, | * | |
| HANH THI LE, and HA LE LLC, | * | |
| and all others similarly | * | **CLASS ACTION COMPLAINT** |
| situated | * | |
| **Plaintiffs** | * | |
| | * | **CIV. NO.**  2;16-cv-14867 |
| **versus** | * | |
| | * | |
| **LEASE FINANCE GROUP, LLC,** | * | **JUDGE**  Lance M. Africk |
| **FIRST DATA GLOBAL LEASING,** | * | |
| **d/b/a GLOBAL LEASING, FIRST** | * | |
| **DATA MERCHANT SERVICES CORP.** | * | **MAG.**  Karen Wells Roby |
| **a/k/a FIRST DATA MERCHANT** | * | |
| **SERVICES, LLC and PAYMENT** | * | |
| **SYSTEMS, INC.** | * | |
| | * | |
| | * | |
| | * | |
| **Defendants** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Ha Thi Le, Ha Thi LLC, Hanh Thi Le, Ha Le LLC, Ngoc Hoang, and Basin Supermarket ("Plaintiffs" or "Putative Class Representatives"), by and through undersigned counsel, sue in their individual capacity and on behalf of a class of persons defined below, and hereby allege the following with knowledge as to their own acts and on information and belief as to all other acts:

## OVERVIEW OF DEFENDANT'S UNLAWFUL CONDUCT

1.     This class action seeks compensatory damages, restitution, disgorgement of profits, costs of suit, treble damages, attorneys' fees, declaratory judgment and injunctive relief and any other relief that this Court deems just and proper arising from Defendants' fraudulent and predatory scheme involving merchant card services and associated equipment leasing.   Merchant card

services enable an individual or a business to accept and process credit card payments; users of such services typically also need to lease or buy credit card processing equipment.

2.      Plaintiffs bring this case as a class action to challenge the unlawful, unfair, fraudulent and deceptive practices of Defendant, Northern Leasing Systems, Inc. ("NLS"), and its affiliates, Lease Finance Group, LLC ("LFG"), First Data Global Leasing d/b/a Global Leasing Company ("FDGL"), First Data Corporation ("FDC"), First Data Merchant Services Corporation a/k/a First Data Merchant Services, LLC ("FDMS"), and Payment Systems, Inc. ("PSI"), (collectively, the "Defendants").

3.      Defendants, through deceptive, fraudulent and predatory practices, have engaged in a scheme to defraud small business owners in connection with the provision of merchant card services (electronic payment processing services) and the leasing of associated equipment (credit card "swiping" machines).

4.      The Defendants have engaged in a range of fraudulent practices, including but not limited to:  inflating and/or overstating the savings on credit card processing fees; fraudulently altering signed contracts purportedly entered into by individuals and businesses seeking merchant card services and associated equipment leases; inducing individuals and small businesses to sign a contract with defendants by fraudulently misrepresenting the actual cost of using the processing services of defendants;   adding previously undisclosed fees to the merchant processing statements and taking same, giving the individuals and businesses thirty day notice but no method of disputing or refuting and new charges and fees;   wrongfully taking unauthorized fees and other charges from bank accounts belonging to such individuals and small businesses; charging exorbitant and unconscionable rates for leasing of credit card processing equipment

(credit card "swiping" machines); failing to notify such individuals and businesses of the terms and costs of the leases at issue as well as the value of the leased equipment; and engaging in aggressive and harassing collection practices for fraudulent debt purportedly due under the leases.

5.  Plaintiffs, on behalf of themselves and their businesses, and on behalf of all other similarly situated Louisiana residents and businesses ("Putative Class Representatives"), bring this action pursuant to Louisiana law, the Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. 51:1401, *et seq.*, and the Consumer Leasing Act, 15 U.S.C. § 1667 *et seq.*

## JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction over this class action because:

   a.   this Court has Federal Question Jurisdiction over the claims brought under the Consumer Leasing Act, 15 U.S.C. § 1667 *et seq.*; and

   b.   this Court has ancillary jurisdiction over all remaining claims.

7.  This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because:

   a.   the number of members of the proposed plaintiff class is greater than 100;

   b.   members of the plaintiff class are citizens of a State different from any Defendant;

   c.   the amount in controversy, aggregated among all individual class members, plus statutory damages and attorney's fees, exceeds $5 million.

8.     Under 28 U.S.C. §1391(a)(2), venue lies in the Eastern District of Louisiana because a substantial part of the events giving rise to this action occurred in the Eastern District of Louisiana.

## PARTIES

**PLAINTIFFS**

9.     Putative Class Representative,  Ha Le is a Louisiana resident who is the sole owner of a small business known as Ha Thi LLC, d/b/a Jazz Salon Hair & Nails, and who at all times alleged in this Complaint operated that business at 3501 Severn Ave, Metairie, Louisiana, 70002.

10.     Putative Class Representative, Ha Thi LLC, d/b/a Jazz Salon Hair & Nails, is a Louisiana business which at all times alleged in this Complaint operated at 3501 Severn Ave, Metairie, Louisiana, 70002.

11.     Putative Class Representative, Hanh Le a/k/a Hanh Thi Le, is a Louisiana resident and sole owner of a small business known as Ha Le LLC d/b/a Avalon Nails, and who at all times alleged in this Complaint operated that business at 4639 Magazine St., Suite C, New Orleans, Louisiana, 70115.

12.     Putative Class Representative, Ha Le LLC d/b/a Avalon Nails, is a Louisiana business which at all times alleged in this Complaint operated at 4639 Magazine St., Suite C, New Orleans, Louisiana, 70115.

13.     Putative Class Representative, Ngoc Hoang, is a Louisiana resident who owns a small business known as Basin Supermarket, Inc. d/b/a Basin Supermarket, and who at all times alleged in this Complaint operated that business at 237 Basin Street, New Orleans, Louisiana 70112.

4

14.     Putative Class Representative, Basin Supermarket, Inc. d/b/a Basin Supermarket, is a Louisiana business which at all times alleged in this Complaint operated at 237 Basin Street, New Orleans, Louisiana 70112.

## DEFENDANTS

15.     Defendant, Lease Finance Group, LLC ("LFG"), is a Delaware limited liability company with its principal place in the County and State of New York. LFG is engaged in the equipment lease financing and service business. In the course of its business, LFG supplies financing for the leasing of certain equipment to small business owners arising out of or related to agreements for merchant card services.

16.     Defendant, Northern Leasing Systems, Inc. ("NLS"), is a New York corporation with its principal place of business at 333 7th Avenue, 3rd Floor, New York, New York 10001. NLS is engaged in merchant card services business and in the equipment lease financing and service business and upon information and belief is the affiliate, alter ego and umbrella organization of LFG and many other shell entities that provide merchant card services and/or conduct leasing operations of certain equipment to small business owners arising out of or related to agreements for merchant card services.

17.     Defendant, First Data Global Leasing, a/k/a or d/b/a Global Leasing Company ("FDGL"), upon information and belief, is a non-Louisiana corporation with its principal place of business at 633 West Fifth Street, #6770, Los Angeles, California. FDGL is engaged in the credit card processing equipment lease financing and service business. Upon information and belief, FDGL is a wholly owned subsidiary of either First Data Merchant Services Corporation or First Data Corporation.

18.     Defendant, First Data Merchant Services Corporation a/k/a or d/b/a First Data Merchant Services, LLC ("FDMS"), is a Florida corporation with its principal place of business at 5565 Glenridge, Connector NE, Suite 2000, Atlanta, Georgia 30342. FDMS is engaged in the credit card processing and service business. Through its subsidiaries and affiliates, including but not limited to FDGL, Defendant FDMS is also engaged in the credit card processing equipment lease financing and service business.     Upon information and belief, FDMS is the affiliate, alter ego, parent and/or umbrella organization of FDGL and many other shell entities that conduct leasing operations and provide merchant card services for small businesses throughout the United States and particularly in the State of Louisiana.

19.     Defendant, First Data Corporation ("FDC"), is a non-Louisiana corporation with its principal place of business at 5565 Glenridge, Connector NE, Suite 2000, Atlanta, Georgia 30342. FDC is one of the largest credit card processing companies in the United States, and perhaps the planet. Through its subsidiaries and affiliates, including but not limited to FDGL and FDMS, Defendant FDC is also engaged in the credit card processing equipment lease financing and service business.  Upon information and belief, FDC is the affiliate, alter ego, parent and/or umbrella organization of FDMS and FDGL and many other shell entities that conduct leasing operations and provide merchant card services for small businesses throughout the United States and particularly in the State of Louisiana.

20.     Together, LFG, NLS, FDGL, FDMS and FDC are referred to herein as the "Lease Financing Defendants."

21.     Together, FDMS and FDC are sometimes referred to herein as the "Merchant Services Defendants."

6

22.    Defendant, Payment Systems Corp. a/k/a or d/b/a Payment Systems, Inc. ("PSI"), is a non-Louisiana corporation with its principal place of business in Los Angeles, California. PSI is an Independent Sales Organization (ISO) utilized by the Merchant Services Defendants and the Lease Finance Defendants to induce Plaintiffs and other small business owners into entering agreements for merchant card services (electronic payment processing services) and the leasing of associated equipment (credit card "swiping" machines).

23.    Merchant Services Provider Defendants, Leasing Defendants, and ISO Defendants, including PSI, have created an associated-in-fact enterprise designed to defraud small businesses. At all times herein mentioned, each of the Defendants was the agent, or representative, of the other Defendants and, in doing the things herein alleged, was acting within the scope and course of his/her/its authority as such agent, or representative, and with the permission and consent of each Defendant.

24.    At all times herein mentioned, the acts and omissions of Defendants, and each of them, concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

25.    At all times herein mentioned, Defendants, and each of them, ratified each and every act or omission complained of herein. At all times herein mentioned, the Defendants, and each of them, aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

## STATEMENT OF FACTS

26.    Defendants are engaged in a state-wide predatory scheme to defraud small business owners in connection with the provision of merchant card services (electronic payment processing service agreements) and the leasing and financing of associated equipment (credit card "swiping" machines).

27.    Leasing Defendants, in contrast to the industry practice of capping the amounts at which equipment can be leased based on the purchase price of the equipment, have instead allowed ISOs marketing on their behalf to set terms at rates that have no relationship to the price of the equipment and lock merchants into four or five year leases. Leasing Defendants then pay the ISO based on the present value of the expected future payment stream, creating an incentive for the ISOs to set the monthly lease rates as high as possible.

28.    Operating in concert, and upon information and belief through numerous shell entities, Defendants pay substantial commissions to their agents, including the ISO Defendant, PSI, to obtain, by any means, Plaintiffs' signatures on a document that is formatted as both an application and a contract for credit card processing services (which is commonly called a "Merchant Processing Application and Agreement") and on a standard form one-page equipment lease, sometimes collectively referred to herein as the "Agreements."

29.    To obtain Plaintiffs' signature on the Agreements, Defendants, through the ISOs, promise Plaintiffs and other small business owners lower transaction fees for their merchant processing services than their current providers can offer.

30.    After the applicant has signed the Agreements, Defendants alter the contracts by adding pages that were never shown to the applicants and by filling in the blank areas with new terms.

These newly added pages and terms include purported provisions for early termination fees, liquidated damages, liability limitations, and choice-of-law and choice-of-forum provisions. Oftentimes, Defendants go so far as to forge the initials or signatures of the small business owners on the newly added pages or filled-in areas.

31.     The contracts contain unconscionable provisions, including long-term leases that require the small business owner to pay wildly inflated monthly rental fees for credit card processing terminals and inflated early termination fees, and require the small business owners to personally guarantee the Agreements.  The Agreements also authorize Defendants to debit all payments purportedly due under the agreements, as of the date of signing or as added by Defendants at any time, directly from Plaintiffs' bank accounts.

32.     Once Plaintiffs' signatures are obtained (or fraudulently inserted through electronic or written forgery), Defendants electronically debit Plaintiffs' bank accounts for higher-than-disclosed processing rates, inflated rental fees, and other charges which Defendants, at their sole discretion and without approval, add to the leasing contract and/or the merchant processing agreement.

33.     Defendants' inflated, undisclosed and/or unauthorized withdrawals include, but are not limited to: (a) over-charges for property taxes, where Defendants pocket the difference between what was charged and what Defendants paid; (b) undisclosed administrative tax processing fees for filing property tax returns in connection with such property tax payments; (c) charges per month per piece of leased equipment towards an "LDW" ("loss damage waiver") program, which program purports to provide what is in fact illusory insurance coverage for the "leased equipment"; (d) membership in a "chargeback program" sometimes called "Carepoint"; (e)

overstating the number of batches ("batches" is a term used to define the closing run of the machine for the day by a merchant.) enabling them to increase their revenue by overstating same; (f) adding a "PCI VALIDATION Fee" to the cost of merchant processing; (g) adding a fee for "regulatory product" to the cost of merchant processing; (h) adding a fee for "TIN/TFN INVALID" to the cost of merchant processing.

34.     Defendants are involved in various aspects of the market for electronic payment processing services, which involves several different players, often working together to defraud individuals and small business owners who have need of such services.  The Lease Finance Defendants ostensibly supply financing for the leasing of credit card processing equipment and other electronic point-of-sale equipment.    The Lease Finance Defendants conspire with providers of payment processing services, here FDC and FDMS (Merchant Services Provider Defendants), and the Independent Sales Organizations (ISOs), here PSI, to defraud merchants who have need of such services.

35.     In order to accomplish their fraudulent scheme, the Merchant Services Provider Defendants and Lease Finance Defendants have established relationships with ISOs all over the United States.  The ISOs act as agents for the Merchant Services Provider Defendants and Lease Finance Defendants and provide the sales force necessary to effectuate the scheme orchestrated by the Merchant Services Provider Defendants and Lease Finance Defendants.

36.     Sales agents working for the ISOs and in furtherance of the scheme, approach small business owners who may want to use, or who already use, electronic payment processing services and induce them to sign up for the Merchant Services Provider Defendants' credit card processing services, promising lower rates for this service.  The sales agent also induces the

small business owner to sign a lease with the Lease Finance Defendants for the equipment necessary to process payments. Thus, the sales agent sells the ISO's services, the Merchant Services Provider Defendants' credit card processing services, and the Lease Finance Defendants' leasing services in what appears to the small business owner to be a single, undivided transaction. Lease of the equipment through the Lease Finance Defendants is presented by the sales agent as a mandatory requirement for obtaining the ISO's and Merchant Services Provider Defendants' credit card processing services and corresponding promised lower rates.

37. The first page of the form lease appears to be a complete document. It contains all the material information normally associated with such transactions (name, address, amount, equipment information, term, bank information) and signature blocks for both parties. Since the signature of parties to a document such as a lease is always at the end of the document, Class Members are led to believe that the lease is a one-page document containing all the terms of the lease.

38. The first page of the form lease contains a box entitled "Lease Acceptance," which contains the space for Class Members' signature for acceptance of the lease and the space for signature of acceptance by Defendants.

39. That "Lease Acceptance" box is followed by another box directly below it which provides for Class Members' personal guaranty. Consequently, the first page effectively conveys that the form lease is a one-page document. Class Members are routinely led to believe that the form lease is comprised of just that one page, which belief was actively fostered by Defendants' agents, particularly agents of the ISOs, at the time of lease-signing.

40.     Upon information and belief, the document that the Class Members sign also does not state it is a "Non-Cancellable Lease." Those words are later added in.

41.     After the applicant has signed the one-page lease, Defendants alter the one-page lease by adding additional pages that were never shown to the applicants and by filling in the blank areas with new terms.  These newly added pages and terms include purported provisions for previously undisclosed administrative tax fees, loss damage waiver, early termination fees, liquidated damages, liability limitations, and choice-of-law and choice-of-forum provisions.  Oftentimes, Defendants go so far as to forge the initials or signatures of the small business owners on the newly added pages or filled-in areas.

42.     In the alternative, if the sales representative brings additional pages, they are clipped together, and the agent, after obtaining the signature on the first page, quickly lifts it to reveal only the lower left corner of any subsequent pages, each with typeface so small as to be unreadable, and instructs the applicant to merely initial.

43.     Once signed by the Class Member, the lease is then immediately assigned that to one of the many shell companies of the Lease Finance Defendants. Consistent with this unlawful scheme, the sales representative is always in a hurry, but assures the Class member that a copy of the document that was signed will be provided at a later date.   Class Members are never given copies, or an opportunity to make copies, of the form lease at the time of signing.  When class members receive their copy, of course, Defendants assert that the form lease has allegedly become "irrevocable" and non-cancellable for the entire term, usually 48 months but as long as 60 months..

44.     By routinely concealing the additional pages of the lease, Defendants have been willfully causing, enabling, permitting and encouraging its representatives/salesmen to misrepresent the terms and effects of the lease, and the obligations being personally guaranteed by the Class Members.  Such representatives/salesmen routinely give an innocuous picture of the lease, pointing to the only page disclosed to the Class Member and not saying one word about the grossly inequitable and oppressive terms therein. Defendants routinely disclaim all such representations at lease inception, and point to the merger clause in the undisclosed pages; this enables Defendants' representatives and salesmen to make misrepresentations with abandon – anything to clinch the sale.

45.     Moreover, even when Defendants belatedly send copies of the form lease, i.e. after it has allegedly been accepted and become irrevocable, such copies are made at reduced size (2 pages reduced to 1).  In so doing, the already unreadable, legalistic terms are rendered even more difficult to read or understand by Class Members. Accordingly, it is often months before Class Members even know of the existence of additional pages to the form lease and of all the terms of the form lease.

46.     The leases offered by the Lease Finance Defendants are exorbitantly inflated and unconscionable.  The Lease Finance Defendants lease equipment with a fair market value between $200 and $400 dollars if purchased outright. The lease payments for Class Members range between $99 and $200 dollars *per month over a period of at least 48 months*, so that merchants end up paying at least between $4,800 and $9,600 for the equipment.  The Lease Finance Defendants hide the actual fair market value of the equipment from the small business owners.

47.     Moreover, if they should decide to terminate at the end of the "non-cancellable" lease, they must pay fees that are unwarranted and exorbitant, including a restocking fee of $150.00.

48.     The ISO and Lease Finance Defendants induce small business owners to accept these exorbitant equipment lease rates by having the sales agent promise huge savings on the monthly cost of Merchant Services Provider Defendants' credit card processing services, so that the net cost to the small business owners is made to appear lower than the cost of processing services offered by competitors. Thus, by offering the processing services and the leases together through the single sales agent, the Defendants are able to inflate the cost of the equipment lease and hide the inflated cost. The ISO is then paid by the Leasing Defendants based upon the present value of the future payments from the lease, incentivizing the ISO to market the unconscionable contract and to set a term and a rate as high as possible.

49.     The ISOs and Merchant Services Provider Defendants profit too because the cost savings are illusory; in reality, through a variety of techniques described below, the ISOs and Merchant Services Provider Defendants charge the small business owner substantially more fees for credit card processing services than the sales agent represents.

50.     In a legitimate lease transaction, the lessor's ability to inflate the lease payments is usually limited by the value of the equipment as security for the lease. If the lessee defaults on the lease, the lessor has a remedy to repossess the equipment and offset its loss. However, where the initial lease calls for payments totaling more than 20 times the value of the equipment, repossession provides no remedy if the lessee defaults. The Defendants are able to circumvent this limit on their ability to offer exorbitantly inflated leases by requiring the merchants to *personally* guarantee the lease payments. Having secured this personal guarantee, the

Defendants set any payment amount they choose, with no relationship to the value of the equipment being leased, as the sales agent induces the small business owner to enter into the lease agreement based upon their illusory promise that the costs will be made up through the savings on credit card processing services fees.

51.     As part of the process of entering into the lease, small business owners are required to provide banking information and to give permission to the Defendants to debit lease payments automatically from the business' bank accounts. At the time that this consent is given, the individual/small business owner is unaware that Defendants will use this consent to unilaterally take not only the agreed upon and highly inflated lease payments, but also any additional sums that the Defendants opt, at their discretion, to take from the account.   The Defendants claim that these payments represent additional fees authorized by the leases the small business owners have signed, but in many cases, these fees are contained on pages not shown to the merchant, but rather fraudulently added to the lease after the small business owner has already signed the original one-page lease, or even on pages on which the merchant's signature has been forged.

52.     To skirt any allegations of unauthorized charges, even where fees may be authorized, the Defendants insert a clause which enables them to change the contract terms with thirty days' notice, which enables them to arbitrarily assert more and more "fees" and then withdraw more money from the small business owner's bank account than the amount that they originally represented, either for a pre-disclosed fee or service at the time that the lease was originally presented, or added during the lease term.

53.     The business owner has no recourse when that occurs, as they cannot cancel the agreement, regardless of the fees, costs, and add-ons that continue to mount.

54.     For their part, the Merchant Services Provider Defendants and ISOs, including PSI, use these same techniques to charge more for their credit card processing services than the discounted prices used to induce small business owners to sign up in the first place. Just as the Lease Finance Defendants obtain banking information and authorization to debit a small business owner's bank account directly, so too the Merchant Services Provider Defendants and ISOs obtain this information to deposit credit card payments, and also to withdraw the monthly processing fees. They, too, then debit the bank account for amounts in excess of the rates promised to the small business owners. Again, these additional fees may be contained on pages of the processing agreement that were never shown to the small business owner and only added to the agreement by the ISO and/or Merchant Services Provider Defendants after the small business owner already signed. The Merchant Services Provider Defendants and ISOs, including PSI, may even forge the small business owner's signature on such additional pages. They also withdraw amounts in excess of the amounts authorized and continue to debit the small business owner's bank account after the Agreements have been terminated.

55.     The ISOs send the merchant processing summaries to the small business owner each month, which include all of the costs associated with the credit card processing that month. These statements are confusing and do not match what is actually deducted from the small business owners' bank account. Most often on the front of this statement, in small face type, additional fees are added. These fees are not stated it numbers, but in words buried within several paragraphs of text, so that their appearance is not readily apparent upon viewing the statement. When the small business owner realizes that the amounts being debited from the bank account are in excess of the amounts represented, there is no remedy. Defendants tell the small business owner that the Agreements cannot be cancelled. Defendants continue to debit the small business

owner's bank account forsubsequently added and meaningless fees for credit card processing such as "CarePoint" and unconscionable lease payments for items such as the Loss Damage Waiver.

56. When a small business owner changes bank accounts, or advises the bank that further drafts from the account are not authorized, as this is the only method of stopping the takings from the account, Defendants routinely proceed against him or her personally, bombarding the small business owner with as twenty harassing phone calls per day, and then send collection letters informing the individual guarantors that their failures to make payments have been reported to credit agencies and threatening to sue the owner personally in New York.

57. When the individuals do not succumb to Defendants' threats, Defendants commence the collection actions in New York Civil Court, knowing that t the cost of travelling to New York and hiring a lawyer to defend such a lawsuit would be prohibitive for many consumers who live as far away as Louisiana.

58. Upon information and belief, Defendants have filed more than 30,000 collection actions between 2010 and 2015 in New York Civil Court, obtaining more than 19,000 default judgments against individual consumers during that time often because the consumer either was not aware of the lawsuit or could not appear in court to defend him or herself because he or she did not live in the New York area.

59. Defendants have conspired with one another and with other unscrupulous ISOs and marketing agents to defraud consumers and small businesses.

60. At all times herein mentioned, each of the Defendants was the agent, servant, representative, officer, director, partner or employee of the other Defendants and, in doing the

things alleged herein, was acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

61.     At all times herein mentioned, Defendants, and each of them, were members of, and engaged in, a joint venture, partnership and common conspiracy, and acting within the course and scope of, and in pursuance of, said joint venture, partnership and common conspiracy.

62.     At all times herein mentioned, the acts and omissions of Defendants, and each of them, contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

63.     At all times herein mentioned, Defendants, and each of them, ratified each and every act or omission complained of herein.  At all times herein mentioned, the Defendants, and each of them, aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

64.     At all times herein mentioned, Defendants, and each of them, knew or had reason to know of any and all acts consisting of fraud, misrepresentation, and any and all other acts of each and all of the other Defendants to induce the small business owners to sign contracts which inure to the benefit of each and all of the other Defendants.

**Ha Thi Le's Transaction**

65.     In September of 2012, Putative Class Representative, Ha Thi Le, was approached at her place of business (Jazz Nails) by Vina Nguyen, an agent of Defendant PSI, who promised her that she could substantially reduce her costs for credit card processing if she agreed to enter an

agreement with PSI and an associated lease for her credit card processing equipment. At the time, Ha Thi Le was using a different merchant service provider for electronic payment transactions.

66.     Vina Nguyen promised Ha Thi Le that she would save money each month on credit card processing service fees even after deduction of payments for the equipment lease. Ha Thi Le relied upon the assertions of Vina Nguyen, who induced Ha Thi Le to sign the lease and merchant processing agreement with illusory promises that the pricing plan for credit card processing services she was offering were well below that of Merchant Services Provider Defendants' competitors, including the merchant service provider that Ha Thi Le was using at the time.

67.     Solely based upon this representation, on September 17, 2012, Ha Thi Le executed a "Merchant Processing Application and Agreement" with PSI and Merchant Services Provider Defendants for their credit card processing services and corresponding promised lower rates in Metairie, Louisiana.

68.     Ha Thi Le owned a nail salon, and was neither expert nor familiar with the complex array of costs which could or would be assessed pursuant to page 3 of the Merchant Processing Application and Agreement, had she been given these pages to review and had the opportunity to ask questions.

69.     Simultaneously and coincident with the Merchant Processing Application, Vina Nguyen presented Ha Thi Le with a one-page document which purported to be and was represented to be the entire lease agreement with FDGL for the lease and financing of its credit card processing equipment. The term of the lease was 48 months and the lease payments were $65.00 per month.

70.     Vina Nguyen told Ha Thi Le that the equipment lease was a mandatory requirement for obtaining the PSI's and Merchant Services Provider Defendants' credit card processing services and corresponding promised lower rates.

71.     On September 17, 2012, Ha Thi Le executed the one-page lease agreement with FDGL for credit card processing equipment in Metairie, Louisiana.  Ms. Nguyen stated that she was in a hurry, and told Ms. Ha Le that she should just sign where she indicated and that she (Ms. Nguyen) would come back later with a copy for her records

72.     Vina Nguyen neither presented Ha Thi Le with any additional pages purporting to be part of the equipment lease nor did Ha Thi Le initial any additional pages purporting to be part of the equipment lease.

73.     When Ha Thi Le reviewed her bank statements she saw items which she did not recognize withdrawn from the bank account. The monthly Merchant Processing Statements provided by defendant PSI contained fees, discounts, and an array of charges for items which were never divulged or were crossed out as not relevant prior to the commencement of the agreement.   For reasons which had never been explained or revealed, her "processing fees" were far greater than the 1% she had been promised at inception, and sometimes as high as 5% in a month. In addition, the PSI Merchant Processing Statements did not match the withdrawals from her bank account.

74.     Ha Thi Le also discovered that sums in excess of her already over-inflated lease payments were withdrawn as well, which were not set forth on the one-page lease.

75.     When Ha Thi Le tried to contact PSI and FDGL to complain, she was met with complete indifference and a blanket refusal to honor the rates which had formed the basis of her bargain

with PSI and FDGL. Her contact Vina, was "no longer there" and no one else ever returned her calls.

76.     After many frustrating months of trying to have PSI and FDGL honor their agreements with her, Ha Thi Le closed the bank account from which the sums were being deducted by PSI and FDGL and moved to a different provider.

77.     Shortly thereafter, defendants began calling her on her cell phone, asking for payment. Sometimes she was called as many as 25 times in one day.

78.     On or about September 30, 2014, Defendant LFG, through its attorneys Joseph I. Sussman, P.C., Joseph I. Sussman and Eliyahu R. Babad, sent a demand letter to Ha Thi Le seeking $2,929.61 which purportedly represented all unpaid lease payments with interest as of that day, plus attorney's fees, as well as the return of the equipment. LFG informed Ha Thi Le that LFG had reported her failure to make payments to the credit bureaus as a chargeoff or collection account. LFG expressly threatened to bring a collection suit if Ha Thi Le failed to pay the balance demanded. Defendants continued to call Ha Thi Le numerous times per day, harassing her and disrupting her business.

79.     On or about January 14, 2015, Defendant LFG, through its attorneys Joseph I. Sussman, P.C., Joseph I. Sussman and Eliyahu R. Babad, sent a second demand letter to Ha Thi Le seeking $2,578.38 which purportedly represented all unpaid lease payments with interest as of that day, plus attorney's fees, as well as the return of the equipment. Attached to this second demand letter was a fully executed summons and complaint which LFG threatened was ready to be filed in the event payment was not received within ten days.

80. On or about February 18, 2015, Defendant LFG, through its attorneys Joseph I. Sussman, P.C., Joseph I. Sussman and Eliyahu R. Babad, sent a final demand letter seeking $2,997.41 which purportedly represented all unpaid lease payments with interest as of that day, plus attorney's fees, as well as the return of the equipment. LFG again informed Ha Thi Le that LFG had reported her failure to make payments to the credit bureaus as a chargeoff or collection account. LFG once again expressly threatened to bring a collection suit if Ha Thi Le failed to pay the balance demanded.

81. Upon information and belief, Defendant Lease Finance Group initiated a suit against Ha Le in the Civil Court for the City of New York in 2015, for the sum of $2578.38.

**Hanh Thi Le's Transaction**

82. In September 17, 2012, Putative Class Representative, Hanh Thi Le, was approached at her place of business (Avalon Nails) by Vina Nguyen, an agent of Defendant PSI, who induced Ha Thi Le to change her merchant service provider based upon Ms. Nguyen's assertions that the pricing plan for credit card processing services she was offering were well below that of Merchant Services Provider Defendants' competitors, including the merchant service provider that Hanh Thi Le was using at the time. She also told Hanh Thi Le that this required leasing equipment from her as well..

83. Vina Nguyen promised Hanh Thi Le that she would save money each month on credit card processing service fees even after deduction of payments for the equipment lease. Hanh Thi Le relied upon the assertions of Vina Nguyen, who induced Hanh Thi Le to sign the lease and merchant processing agreement with illusory promises that the pricing plan for credit card processing services she was offering were well below that of Merchant Services Provider

Defendants' competitors, including the merchant service provider that Hanh Thi Le was using at the time.

84.     Solely based upon this representation, on September 17, 2012, Hanh Thi Le executed a "Merchant Processing Application and Agreement" with PSI and Merchant Services Provider Defendants for their credit card processing services and corresponding promised lower rates in Metairie, Louisiana.

85.     Hanh Thi Le owned a nail salon, and was neither expert nor familiar with the complex array of costs which could or would be assessed pursuant to page 3 of the Merchant Processing Application and Agreement, had she been given these pages to review and had the opportunity to ask questions.

86.     Simultaneously and coincident with the Merchant Processing Application, Vina Nguyen presented Hanh Thi Le with a one-page document which purported to be and was represented to be the entire lease agreement with FDGL for the lease and financing of its credit card processing equipment.

87.     The term of the lease was 48 months and the lease payments were $153.00 per month. Ms. Nguyen stated she was in a hurry, and told Ms. Hanh Le that she should just sign where she indicated and that she (Ms. Nguyen) would come back later with a copy for her records.

88.     Vina Nguyen told Ha Thi Le that the equipment lease was a mandatory requirement for obtaining the PSI's and Merchant Services Provider Defendants' credit card processing services and corresponding promised lower rates.

89.     Vina Nguyen neither presented Ha Thi Le with any additional pages purporting to be part of the equipment lease nor did Ha Thi Le initial any additional pages purporting to be part of the equipment lease.

90.     When Hahn Thi Le reviewed her bank statements she saw items which she did not recognize withdrawn from the bank account. The monthly Merchant Processing Statements provided by defendant PSI, contained fees, discounts, and an array of charges for items which were never divulged or were crossed out as not relevant prior to the commencement of the agreement.   For reasons which had never been explained or revealed, her "processing fees" were far greater than the 1% she had been promised at inception, and sometimes as high as 5% in a month. In addition, the PSI Merchant Processing Statements did not match the withdrawals from her bank account.

91.     Hanh Thi Le also discovered that sums in excess of her already over-inflated lease payments were withdrawn as well, which were not set forth on the one-page lease.

92.     When Hanh Thi Le tried to contact PSI and FDGL to complain, she was met with complete indifference and a blanket refusal to honor the rates which had formed the basis of her bargain with PSI and FDGL. Her contact Vina, was "no longer there" and no one else ever returned her calls.

93.     After many frustrating months of trying to have PSI and FDGL honor their agreements with her, Hanh Thi Le closed the bank account from which the sums were being deducted by PSI and FDGL and moved to a different provider.

94.     Hahn Thi Le relied upon the representations of Vina Nguyen, who handed her a document document and told her that the rates she would receive were very favorable, but

without any explanation of the array of charges which could or would be charged depending on variables which were not disclosed at any time to Hahn Thi Le.

95. When Hanh Thi Le tried to contact PSI and FDGL to complain, she received no response.

96. After many frustrating months of trying to have PSI and FDGL respond, explain and honor their agreements with her, Hanh Thi Le closed the bank account from which the sums were being deducted by PSI and FDGL and moved to a different provider.

97. Defendants continued to assess charges for credit processing as well; for example, in December of 2014, charges of $188.85 were accrued against the business, for "miscellaneous " fees associated with the payment processing account, despite the fact that Plaintiff had stopped using this Defendant PSI as the processor.

98. Within days of taking this action, Defendants commenced calling her cell phone more than twenty times per day, harassing Ms. Le and disrupting her business.

99. On or about October 7, 2014, Defendant LFG, through its attorneys Joseph I. Sussman, P.C., Joseph I. Sussman and Eliyahu R. Babad, sent a demand letter to Hanh Thi Le seeking $6,876.71 which purportedly represented all unpaid lease payments with interest as of that day, plus attorney's fees, as well as the return of the equipment. LFG informed Hanh Thi Le that LFG had reported her failure to make payments to the credit bureaus as a chargeoff or collection account. LFG expressly threatened to bring a collection suit if Hanh Thi Le failed to pay the balance demanded. The threatening phone calls continued.

100. On or about November 11, 2014, Defendant LFG, through its attorneys Joseph I. Sussman, P.C., Joseph I. Sussman and Eliyahu R. Babad, sent a demand letter to Hanh Thi Le

seeking $6,916.32 which purportedly represented all unpaid lease payments with interest as of that day, plus attorney's fees, as well as the return of the equipment. LFG again informed Hanh Thi Le that LFG had reported her failure to make payments to the credit bureaus as a chargeoff or collection account. LFG once again expressly threatened to bring a collection suit if Hanh Thi Le failed to pay the balance demanded. The telephone calls did not abate.

101.    On January 26, 2016, the Defendants, through Defendant LFG, filed a collection suit against Hanh Thi Le in the City Court of the City of New York seeking the purported remaining unpaid lease balance of $4,590.00 with interest and the sum of $1,147.50 to pay attorney's fees and legal costs incurred in bringing the collection action.

**Ngoc Hoang's Transaction**

102.    In April of 2013, Putative Class Representative, Ngoc Hoang, was approached at his place of business (Basin Supermarket) by Vina Nguyen, an agent of Defendant PSI, who promised him that he could substantially reduce his costs for credit card processing if he agreed to enter an agreement with PSI and an associated lease for his credit card processing equipment. At the time, Ngoc Hoang was using a different merchant service provider for electronic payment transactions.

103.    Vina Nguyen promised  Ngoc Hoang that he would save money each month on credit card processing service fees even after deduction of payments for the equipment lease. He relied upon the assertions of Vina Nguyen, who induced him to sign the lease and merchant processing agreement  with illusory promises that the pricing plan for credit card processing services she was offering were well below that of Merchant Services Provider Defendants' competitors, including the merchant service provider that Ngoc Hoang was using at the time.

104.     Solely based upon this representation, on April 3, 2013, Mr. Hoang executed a "Merchant Processing Application and Agreement" with PSI and Merchant Services Provider Defendants for their credit card processing services and corresponding promised lower rates in New Orleans, Louisiana.

105.     Mr. Hoang owned a small sandwich and grocery shop, and was neither expert nor familiar with the complex array of costs which could or would be assessed pursuant to page 3 of the Merchant Processing Application and Agreement, had he been given these pages to review and had the opportunity to ask questions.

106.     Simultaneously and coincident with the Merchant Processing Application, Vina Nguyen presented  Mr. Hoang with a one-page document which purported to be and was represented to be the entire lease agreement with FDGL for the lease and financing of its credit card processing equipment. The term of the lease was 60 months and the lease payments were $99.00 per month.

107.     Vina Nguyen told Ngoc Hoang that the equipment lease was a mandatory requirement for obtaining the PSI's and Merchant Services Provider Defendants' credit card processing services and corresponding promised lower rates.

108.     On April 3, 2013 Mr. Hoang executed the one-page lease agreement with FDGL for credit card processing equipment in New Orleans, Louisiana.  Ms. Nguyen stated that she was in a hurry, and told Mr. Hoang  he should just sign where she indicated and that she (Ms. Nguyen) would come back later with a copy for his records

109.     Vina Nguyen neither presented Ngoc Hoang with any additional pages purporting to be part of the equipment lease nor did Ha Thi Le initial any additional pages purporting to be part of the equipment lease.

110. When Ngoc Hoang reviewed his bank statements he saw items which he did not recognize withdrawn from the bank account. The monthly Merchant Processing Statements provided by defendant PSI, contained fees, discounts, and an array of charges for items which were never divulged or were crossed out as not relevant prior to the commencement of the agreement. For reasons which had never been explained or revealed, his "processing fees" were far greater than the 1% she had been promised at inception, and sometimes as high as 5% in a month.

111. In addition, the PSI Merchant Processing Statements did not match the withdrawals from his bank account.

112. Ngoc Hoang also discovered that sums in excess of his already over-inflated lease payments were withdrawn as well, which were not set forth on the one-page lease.

113. After many frustrating months of trying to have PSI and FDGL honor their agreements with him, Ngoc Hoang closed the bank account from which the sums were being deducted by PSI and Leasing Defendants. He stopped using the equipment prior to this action, but sums were still drafted from his account.

114. On or about April 8, 2014, Defendant LFG, through its attorneys Joseph I. Sussman, P.C., Joseph I. Sussman and Eliyahu R. Babad, sent a demand letter to Ngoc Hoang seeking $7,430.83 which purportedly represented all unpaid lease payments with interest as of that day, plus attorney's fees, as well as the return of the equipment. LFG expressly threatened to bring a collection suit if Ngoc Hoang failed to pay the balance demanded. Attached to this demand letter was a fully executed summons and complaint which LFG threatened was ready to be filed in the

event payment was not received within ten days. Defendants began calling Mr. Hoang incessantly.

115.    On or about August 6, 2014, the Defendants, through Defendant LFG, filed a collection suit against Ngoc Hoang in the City Court of the City of New York seeking the total of $8,354.57 which was purported to be the purported remaining unpaid lease balance of with interest and attorney's fees and legal costs incurred in bringing the collection action.

116.    On or about March 11, 2015, Defendant LFG, through its attorneys Joseph I. Sussman, P.C., Joseph I. Sussman and Eliyahu R. Babad, sent a letter to Ngoc Hoang informing him that LFG received a judgment against him on March 2, 2015 in the amount of $6,622.86 and enclosed copies of the judgment with Notice of Entry.

## CLASS ACTION ALLEGATIONS

117.    Plaintiffs bring this claim individually and on behalf of all other similarly situated persons pursuant to Rule 23 of the Federal Rules of Civil Procedure.

118.    The class is defined as follows:

> All Louisiana persons (including natural persons, corporations, partnerships or other legal entities) who applied or contracted for merchant card services and/or related equipment leasing with any of the Defendants and/or signed personal guarantees for such contracts and leases.

Such persons shall be referred to as "Class Members" or the "Class."

*Fed. R. Civ. P. Rule 23(a)*

119.    Plaintiffs do not know the exact size of the Class, which is known only to Defendants, but it is estimated that it is comprised of more than 100 persons.    The persons in the Class are so

numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and courts.

120.    This action presents questions of law and fact common to the Class including:

    a.    Whether Defendants engaged in activity designed to defraud the Class;

    b.    Whether the contracts or leases entered into by the Class Members are unenforceable and/or unconscionable;

    c.    Whether Defendants unfairly, unlawfully and/or deceptively failed to provide Class Members all pages of the purported operative agreements;

    d.    Whether Defendants unfairly, unlawfully and/or deceptively failed to inform class members of the exorbitant rates for leasing equipment;

    e.    Whether Defendants' conduct violates the Louisiana Unfair Trade Practice Act and Consumer Protection Law ("LUTPA"), La. R. S. 51:1401 *et seq.*;

    f.    Whether Defendants' conduct violates the Consumer Leasing Act; and

    g.    Whether Defendants' were unjustly enriched as a result of their actions.

121.    The claims brought by Class Representative Plaintiffs are typical of the Class because Plaintiffs completed applications and/or entered into contracts with Defendants and their agents that are identical or nearly identical to the standard form contract used by Defendants and their agents. Thus, Plaintiffs and Class Members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law. The injuries and damages of each Class Member were caused directly by Defendants' wrongful conduct in violation of law as alleged.

122.    Class Representative Plaintiffs will fairly and adequately represent the interests of the Class because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with or antagonistic to the interests of Class Members.

123. Class Representative Plaintiffs have hired counsel who are able and experienced in class action litigation and will vigorously litigate this action. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by seeking the maximum possible recovery for Class Members.

*Fed. R. Civ. P. Rule 23(b)(3)*

124. Questions of law and fact common to the Class Members predominate over any pertinent questions to individual members. Specifically, questions of law and fact regarding liability of Defendants are common to Class Members and predominate over any individual issues that may exist, such, that by prevailing on their own claims, Plaintiffs necessarily will establish Defendants' liability to all Class Members.

125. A class action is superior to other available methods of adjudicating the claims in this action because:

    a.    individual damages to any one class member are relatively small, making the expense of prosecuting or controlling individual litigations prohibitive or impractical for class members;

    b.    no member of the class has commenced litigation to determine the questions presented; and

    c.    a class action can be managed with efficiency and without undue difficulty because Defendants have used standardized contracts, have advertised in standardized formats, and Plaintiffs and members of the Plaintiff Class were similarly affected by Defendants' deceptive schemes.

## FIRST CAUSE OF ACTION

### Breach of Contract

126.     Plaintiffs, individually, and on behalf of the Plaintiff Class, reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

127.     Defendants engaged in a pattern and practice of charging and collecting sums in excess of those specified in the one-page equipment lease and in the credit card processing and service fees contract provided to Plaintiffs and Class Members and by imposing different terms on the lease and contract than those promised and revealed to Plaintiffs and Class Members, and breached its contracts with Plaintiffs and Class members.

128.     In doing so, to the extent that Plaintiffs and the Class Members entered into enforceable contracts with Defendants, Defendants breached those contracts.   Defendants willfully and systematically concealed the terms of the contracts from Plaintiffs, the Class, and the general public, in a practice that is ongoing.

129.     Defendants willfully concealed that they had reserved the right to alter, amend, or increase the associated fees and costs at any time, and that any or all of these actions did not give the Plaintiffs and Class Members the right to cancel the agreement.

130.     Defendants further breached the covenant of good faith and fair dealing implied in every contract. Defendants unfairly interfered with Plaintiffs' rights to receive the benefits of this contract by engaging in a variety of actions, including inserting additional pages and terms into the contract, unilaterally changing the terms and conditions of the contract, refusing to address complaints by Plaintiffs and the class about billing and service, and engaging in a pattern of threats and harassment to enforce the fraudulent terms and conditions of the contracts.

Plaintiffs and the Class Members have been damaged by Defendants' breach of contract as described herein.

131.    By reason of the foregoing, Defendants are liable to Plaintiffs and the Class Members for breach of contract in an amount to be proved at trial.

## SECOND CAUSE OF ACTION

### Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401 *et seq*, by all Defendants

132.    Plaintiffs, individually, and on behalf of the Plaintiff Class, reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

133.    The Louisiana Unfair Trade Practices Act ("LUTPA") prohibits "[u]nfair methods of competition, and unfair or deceptive acts or practices in the conduct of any trade or commerce." La R.S. 51:1405.

134.    The Defendants violated LUTPA because they misled Plaintiffs and the Plaintiff Class about the purported credit card processing and service fees savings that were promised and assured by Defendants.

135.    The Defendants violated LUTPA because they did not reveal the true amounts of the payments over the entire term of the lease.

136.    The Defendants violated LUTPA because they represented to Plaintiffs that the contract or lease was only a one-page document, intentionally withholding from Plaintiffs all pages of the lease beyond page 1 and the terms therein.

137. The Defendants violated LUTPA because they charged the putative class Plaintiffs amounts unauthorized by the agreement signed by Plaintiffs.

138. The Defendants violated LUTPA because they charged the putative class Plaintiffs exorbitant amounts well over market value for the lease of the equipment.

139. These acts were and are unconscionable, unfair, deceptive and misleading to customers.

140. Because of the Defendants' unconscionable, unfair, deceptive acts, Plaintiffs and members of the Plaintiff Class suffered damages including, but not limited to, the payments made thus far to Defendants above the purported credit card processing and service fees savings that were promised and assured by Defendants, the payments made to Defendants for amounts not due under the contracts, and for the exorbitant lease payments made to the Defendants.

141. Pursuant to LUTPA, Plaintiffs are entitled to recover their reasonable attorney's fees and costs incurred in bringing this action plus treble damages. See La R. S. 51:1409.

## THIRD CAUSE OF ACTION

### Violation of Consumer Leasing Act against All Defendants

142. Plaintiffs individually, and on behalf of the Plaintiff Class, reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

143. The lease entered into between Defendants and the Plaintiff Class, including Plaintiffs, failed to disclose the payment schedule and total amount of periodic payments.

144. The lease entered into between Defendants and the Plaintiff Class, including Plaintiffs, failed to disclose the total amount of other charges payable to the lessor.

34

145. The lease entered into between Defendants and the Plaintiff Class, including Plaintiffs, failed to disclose the total of payments, with a description such as "the amount you will have paid by the end of the lease."

146. The lease entered into between Defendants and the Plaintiff Class, including Plaintiffs, failed to make a statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the lease term.

147. The lease entered into between Defendants and the Plaintiff Class, including Plaintiffs, failed to disclose that the contract prohibited any termination for any reason prior to the end of the lease period.

148. The lease entered into between Defendants and the Plaintiff Class, including Plaintiffs, failed to disclose the rent and other charges, paid by the lessee and required by the lessor as an incident to the lease transaction, with a description such as "the total amount of rent and other charges imposed in connection with your lease [state the amount]."

149. The lease entered into between Defendants and the Plaintiff Class, including Plaintiffs, failed to disclose the total dollar amount for all official and license fees, registration, title, or taxes required to be paid in connection with the lease.

150. Plaintiffs and members of the Plaintiff Class are entitled to the actual damage sustained as a result of the Defendants' failure to comply with the Consumer Leasing Act, statutory damages, calculated as 25% of the total periodic lease payments, but no less than $100 or greater than $1,000 per class member, and attorney's fees and costs.

## FOURTH CAUSE OF ACTION

**Unjust Enrichment against all defendants**

151.    Plaintiffs individually, and on behalf of the Plaintiff Class, reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

152.    The Defendants received a benefit from Plaintiffs and members of the Plaintiffs Class when they inequitably received the lease payments for the equipment. Plaintiffs and members of the Plaintiff Class were injured by having to pay well above market value to Lease the equipment.

153.    The Defendants were unjustly enriched by their unlawful actions resulting in damages to the Plaintiffs and members of the Plaintiff Class.

## FIFTH CAUSE OF ACTION

**Fraud and misrepresentation against all Defendants**

154.    Plaintiffs individually, and on behalf of the Plaintiff Class, reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

155.    Defendants represented that Plaintiffs and the Plaintiff Class members would save significant amounts of money.

156.    Specifically, Defendants told Plaintiffs that each could reduce its credit card processing cards significantly by contracting with Defendants. ISO Defendants knew this statement to be false when it was made. Defendants made this same misrepresentation to thousands of small business owners throughout the class period. In making these representations, ISO Defendants were acting on their own behalf and as agents of Leasing

Defendants herein, and as agents of Merchant Processing Defendants.

157.     ISO Defendants also fraudulently and deceptively failed to inform Plaintiffs and the Plaintiff class that they intended to add undisclosed material terms to the contracts.

158.     ISO Defendants, acting on their own behalf and as agents of both Leasing Defendants and Merchant Processing Defendants, fraudulently and deceptively failed to inform Plaintiffs and Plaintiffs Class members of the following, including, but not limited to: that they would be charged much higher rates than promised, that additional fees, assessments, and other charges labelled as "miscellaneous" could be and would be added to the costs of credit card processing at any time, that they had no option or ability to reject these charges, that lease payments would vary from the amount they believed they were to pay, that the agreements were non-cancellable, that they would be subject to out of state lawsuits, that they would be subject to severe penalties for non-compliance or breach, and the exact terms and conditions of both the lease agreement and the merchant credit processing agreement .

159.     In furtherance of the intent to fraudulently misrepresent the terms of the contracts, ISO Defendants, acting on their own behalf and as agents of Merchant Services Provider Defendants and Leasing Defendants, presented incomplete contracts to Plaintiffs and Plaintiff Class members,

160.     All of Defendants' misrepresentations and omissions were material at the time they were made. They concerned material facts that were essential to the decision undertaken by Plaintiff and the Plaintiffs Class as to whether to lease the equipment and contract with ISO Defendants, Merchant Services Provider Defendants, and/or Leasing Defendants.

161.     ISO Defendants knew their representations to be false and had no reasonable grounds for believing them to be true when made. Leasing Defendants and Merchant Services

Provider Defendants had knowledge of the ISO Defendants misrepresentations when accepting the terms of the contract but entered into the contract to increase their profits, and encourage ISO to obtain these onerous contracts.

162.     Plaintiffs and the Plaintiff Class members relied to their detriment on Defendants' fraudulent representations and omissions. Had Plaintiff and the Plaintiff Class members been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, purchasing credit card swiping equipment and/or choosing a different merchant card services provider, and/or refusing to enter into an agreement with Defendants.

163.     Defendants and their agents had a fiduciary duty to inform Plaintiffs and Plaintiff Class Members, at the time that the contracts were presented, of the true nature of the agreement.

164.     Defendants' omissions regarding the terms of the contract and the fraudulent concealment of terms, or addition of terms, caused Plaintiffs and Plaintiff Class Members to rely to their detriment upon Defendants' omissions. These omissions were material to the decisions of Plaintiffs and Plaintiff Class Members to contract with Defendants for merchant card services or to lease equipment. In making these omissions, Defendants breached their duty to Class Members. Moreover, Defendants gained financially from, and as a result of, their breach, and this gain was solely to the detriment of Plaintiffs and the class.

165.     By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and Plaintiff Class Members to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiff and Plaintiffs Class Members, without limitation, to change equipment providers and credit card processing providers, and instead to lease credit card processing equipment and to enter into

contracts for the processing of credit card payments with Defendants.

166.      Plaintiffs and Plaintiff Class Members justifiably and reasonably relied on Defendants' omissions, and, accordingly, were damaged by the Defendants failure to disclose terms, attempts to conceal terms, and subsequent addition of terms.

166.      As a direct and proximate result of Defendants' misrepresentations, Plaintiffs and Plaintiff Class Members have suffered damages, including, without limitation, all amounts they paid towards their equipment leases and for credit card processing services, as well as any other sums paid for fees, assessments, membership, insurance, or charges of any kind incurred solely by Plaintiffs' and Plaintiff Class Members' contracts with Defendants.

167.      Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Plaintiffs and Plaintiff Class Members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)      Issue an order certifying the Plaintiff Class under Federal Rule of Civil Procedure 23, and appointing Plaintiffs, Ha Thi Le,  Ha Thi LLC, Hanh Thi Le, Ha Le LLC, Ngoc Hoang, and Basin Supermarket, Inc.,  and their Counsel, Lawrence J. Centola, III,  Neil F. Nazareth, Jason Z. Landry, and Susanne Weiner Jernigan, to represent the Plaintiff Class;

(b)      Declare Defendants' acts and practices as described herein to be in breach of their contracts with Plaintiffs and the Plaintiff Class;

(c)     Declare Defendants' acts and practices as described herein to be unlawful, unfair, misleading, and deceptive;

(d)     Declare Defendants' acts and practices as described herein to violate the Consumer Leasing Act;

(e)     Declare Defendants' acts and practices as described herein to violate the Louisiana Unfair Trade Practices Act;

(f)     Award Plaintiffs and the Plaintiff Class actual damages in an amount according to proof for Defendants' wrongful conduct alleged herein;

(g)     Award Plaintiffs and the Plaintiff Class treble damages to the fullest extent allowed by law;

(h)     Order Defendants to make restitution to Plaintiffs and members of the Plaintiff Class;

(i)     Award Plaintiffs and the Plaintiff Class statutory damages to the fullest extent allowed by law;

(j)     Grant Plaintiffs and members of the Plaintiff Class pre-judgment interest on all sums collected;

(k)     Grant costs of suit, including reasonable attorneys' fees, costs, and expenses; and

(l)     Grant all such other relief as the Court deems appropriate.

Respectfully Submitted,

**MARTZELL, BICKFORD & CENTOLA**

*/s/Lawrence J. Centola, III*
**LAWRENCE J. CENTOLA, III (#27402)**
lcentola@mbfirm.com
**NEIL F. NAZARETH (#28969)**
nfn@mbfirm.com
**JASON Z. LANDRY (#33932)**
jzl@mbfirm.com
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
(504) 581-7635 (Fax)

*and*

**Susanne Weiner Jernigan (#14522)**
sue@thejerniganfirm.com
Jernigan Law Firm
829 Baronne Street
New Orleans, LA 70113
(504) 581-9322
(866) 703-7621 (Fax)

**Putative Class Counsel**