UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **HA THI LE ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **No. 16-14867** |
| **LEASE FINANCE GROUP, LLC ET AL.** | **SECTION I** |

### ORDER AND REASONS

Before the Court are two motions filed by several of the defendants. Defendants Lease Finance Group, LLC and Northern Leasing Systems, Inc. (collectively, the "Leasing defendants") move[1] to either dismiss the claims against them or to transfer the claims to the U.S. District Court for the Southern District of New York. Defendants First Data Global Leasing, First Data Merchant Services LLC, and First Data Corporation (collectively, the "First Data defendants"), move[2] to transfer this action to the U.S. District Court for the Eastern District of New York. For the following reasons, both motions are denied.

### I.

The interrelationship between the plaintiffs and the various defendants and contracts at issue is complex and, if the allegations in the complaint are believed, perhaps that is by design. The purported class action plaintiffs are Louisiana small businesses and their individual owners. The defendants are companies which contracted with the plaintiffs to provide their businesses with credit card machines

---

[1] R. Doc. No. 28.
[2] R. Doc. No. 18.

and credit processing services. Although the defendants are separate companies and although the plaintiffs entered into different contracts with various defendants, the plaintiffs allege that the several agreements are all part of a single scam. The amended complaint sets forth the allegations in great detail. The Court recites here only the background necessary to resolve the motions.

If a small business wants to be able to accept credit card payments, it needs both equipment (credit card "swiping" machines) and merchant card services (electronic payment processing services). The First Data defendants and the Leasing defendants collectively satisfy both of those needs—the First Data defendants provide the processing services and the Leasing defendants provide the equipment. The final defendant—Payment Systems—acts as a sales agent on behalf of the First Data defendants and the Leasing defendants.

According to the complaint, Payment Systems approaches small businesses and offers them lower transaction fees for merchant processing services than the businesses are currently receiving. Payment Systems presents the small businesses with two separate agreements: (1) a document which is both an application and a contract for credit processing services, commonly called a Merchant Processing Application and Agreement ("MPAA"); and (2) a one-page equipment contract. Through the MPAA, the small businesses contract with the First Data defendants for processing services. Through the equipment contract, the small businesses lease credit card swiping machines from the Leasing defendants. According to the plaintiff, Payment Systems represents to the small businesses that the lower transaction fees

can only be obtained if both agreements are signed. It appears to the small business owners that they are engaging in a single, undivided transaction.

Both contracts contain provisions whereby the individual small business owners personally guarantee the agreements. Pursuant to the agreements, both the First Data defendants and the Leasing defendants obtain the small business owners' banking information and are authorized to debit payments directly from their bank accounts. Once the small businesses and their owners sign the MPAA and the equipment contract, Payment Systems presents them with a Processing and Equipment Order ("Equipment Order") which provides that Payment Systems is a party to both the MPAA and the equipment contract to the extent it has either a one time or ongoing economic interest in those two agreements. The Equipment Order further provides that neither the MPAA nor the equipment contract may be cancelled for four years, and it integrates the terms of the MPAA and the equipment contract. The small business owners are instructed to sign the Equipment Order as part of the transaction.

After the small businesses and the small business owners individually have signed all of the agreements, the complaint alleges that the defendants begin to charge them additional or substantially greater fees for services than those that were promised by Payment Systems. For example, the plaintiffs claim that the defendants alter the one-page equipment contract by adding additional pages and by filling in blank areas of the original contract with new terms. The new pages and terms add such provisions as administrative tax fees, early termination fees, liquidated

damages, etc.[3] The plaintiffs claim that the defendants often forge the initials or signatures of the small business owners on the newly added pages or filled-in areas.

According to the plaintiffs, once the small businesses realize that their accounts are being overcharged, they attempt to cancel the contracts. The defendants inform them that the agreements are non-cancellable. When the small businesses change bank accounts or advise the bank that further drafts from their accounts are not authorized, the complaint alleges that defendants bombard the small businesses with phone calls and collection letters. When the small businesses attempt to sue, they are told they must litigate all claims in New York. Ultimately, if the defendants are unable to collect, they obtain default judgments against the small business owners in the Civil Court of the City of New York.[4] It appears that such default judgments were obtained against all of the individual plaintiffs in this action. As far as the Court is aware, no default judgments were obtained against the small businesses.

---

[3] In addition to alleging that defendants charge fraudulent fees, the plaintiffs also argue that the terms of their equipment contract are unconscionable and unenforceable. Despite being assured by Payment Systems that the cost of the leased equipment would be offset by the savings in transaction fees, the plaintiffs claim that they are charged exorbitant rates for the credit card swiping machines. According to plaintiffs, the fair market value of the machines varies between $200 and $400 dollars per machine. Yet the lease payments for class members varied between $99 and $200 dollars per machine per month over a period of at least 48 months, so that the small businesses end up paying between $4,800 and $9,600 for the equipment.

[4] Citing to a press release issued by the New York Attorney General's office, the plaintiffs claim that the defendants have filed more than 30,000 such collection actions in New York between 2010 and 2015, obtaining more than 19,000 default judgments. *See* R. Doc. No. 37-1, at 1.

## II.

### A.

Federal law governs the "enforceability" of forum-selection clauses in this circuit. *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 301 (5th Cir. 2016) (citing *Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997)). Under federal law, forum selection clauses are presumptively enforceable. *See Weber v. PACT XPP Techs.*, AG, 811 F.3d 758, 773 (5th Cir. 2016). A party attacking the enforceability of a forum selection clause can overcome the presumption by demonstrating that the clause is "unreasonable under the circumstances" because:

> (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

*Barnett*, 831 F.3d at 301 (quoting *Haynsworth*, 121 F.3d at 963.

Even if a forum selection clause is enforceable, the Court may still decline to order a transfer pursuant to 28 U.S.C. § 1404 under certain circumstances.[5] *See In re Rolls Royce Corp.*, 775 F.3d 671, 678 (5th Cir. 2014). Section 1404 provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any other district or division to which all parties have

---

[5] The converse is also true: a court may order a transfer pursuant to 28 U.S.C. § 1404 even if the forum selection clause is invalid under state law. *See Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 30-31 (1988).

consented." Where there is a binding forum selection clause, however, private interest factors must be counted towards the preselected forum and the court should only consider whether the public interest factors weigh against the transfer. *See Rolls Royce Corp.*, 775 F.3d at 678 (citing *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 582 (2013)).

**B.**

The Leasing defendants ask the Court to transfer the claims against them to the Southern District of New York. They argue that there are two forum selection clauses in the equipment contract which require the transfer: (1) a forum selection clause providing that all disputes arising from or relating to the equipment contract must be resolved in New York courts, and (2) a forum selection clause providing that all disputes relating to the personal guaranty signed by the individual business owners must be resolved in New York courts. The equipment contract also provides that the agreement shall be governed by New York law.

The plaintiffs challenge the enforceability of the forum selection clauses on all four of the recognized grounds. Because the Court agrees that the forum selection clause in the equipment contract is unenforceable as contrary to a strong public policy of Louisiana, however, the Court does not address the other arguments against enforceability.[6]

---

[6] Because the Court concludes that the forum selection clause in the equipment contract is unenforceable under federal law and Louisiana law, it need not delve into the tricky question of whether federal law or state law controls the "validity" of a forum selection clause—if indeed "enforceability" and "validity" remain distinct concepts after the Supreme Court's decision in *Atlantic Marine. See Barnett*, 831 F.3d

6

1.

This being the Eastern District of Louisiana, the forum state here is Louisiana. When determining whether enforcement of the forum selection clause would contravene the law of the forum state, this Court first looks to Louisiana. When doing so, it is important to differentiate between things that are inconsistent with forum state law and things that violate forum state public policy. The two categories are not synonymous, particularly in contract cases where the parties can select that their contract be governed by another state's law.

For example, the Fifth Circuit was faced with just such a situation in *Barnett*. The facts in *Barnett* involved an employment contract which required disputes to be decided in Kuwait applying Kuwaiti law. 831 F.3d 296. The plaintiff employee sued his employer in Texas federal court, arguing that the forum selection clause was invalid under Texas law. The employee pointed to a Texas statute which makes void in Texas any stipulation, contract, or agreement which establishes a limitations period that is shorter than two years. Because application of Kuwaiti law effectively resulted in a shortened limitations period, the employee argued that the Kuwaiti choice-of-law and forum provisions were void. *Id.* at 300-01. The Fifth Circuit disagreed.

Even accepting as true that Texas has a strong public policy against shortening the limitations period, the Court concluded that Texas's public policy was not

---

at 301-03. The Court cautions future litigants, however, that the unsettled nature of "the role state law plays in diversity cases involving forum-selection clauses," *see id.* at 309, may be something of potentially dispositive significance under different facts.

7

implicated by the employment contract. *Id.* at 303. The Fifth Circuit explained that Texas allows parties to select the law which will govern their contract unless doing so would be contrary to a fundamental policy of the state whose law would otherwise apply. Under Texas choice-of-law rules, Texas law would not otherwise apply to the employment contract even in the absence of the Kuwait choice-of-law provision. Accordingly, even assuming that applying the Kuwaiti limitations period would be inconsistent with Texas law, the forum selection clause could not be said to violate Texas public policy where Texas choice-of-law rules would not apply Texas law to the contract. *Id.* at 305-06. The lesson from *Barnett* is clear: a particular result may be inconsistent with forum state law but not violate forum state public policy.

Unlike in *Barnett*, this Court is confronted with a situation where the law selected by the contract would not only be inconsistent with forum state law; it would violate forum state policy. Louisiana has a strong public policy against the inclusion of forum selection clauses in leases of movables which are located in Louisiana. That policy is made evident by the Louisiana Lease of Movables Act ("LMA"), La. R.S. 9:3301 *et seq.* Specifically, section 3303(F) of the LMA provides:

> F. The following agreements by Louisiana lessees are invalid with respect to leases of movable property, or any modifications thereof, to which this Chapter applies:
>
> (1) Agreements in which the lessee consents to the jurisdiction of another state.
>
> (2) Agreements that fix venue.

La. R.S. 9:3303(F). The public policy expressed in La. R.S. 9:3303(F) is implicated here because the LMA applies to "*all leases* of movable property *located in this state*,

8

whether the property is initially leased in Louisiana or subsequently moved into this state." La. R.S. 9:3303(A) (emphasis added). In Louisiana, "[a]ll things, corporeal or incorporeal, that the law does not consider as immovables, are movables." La. Civ. Code art. 475. No one disputes that credit card swiping machines are movables located in Louisiana or that the equipment contract is considered a lease under Louisiana law. As such, forum state law bars the contract's choice of a New York forum.

The Leasing defendants argue that the equipment contract would not be considered a lease under New York law. They assert that the contract is really a "financed lease," which New York considers to be a "security interest" and not a lease.

Unlike a traditional or "true lease," a "financed lease" is an agreement whereby (1) the lessee is obligated to pay total compensation over the base lease term which is substantially equivalent to or which even exceeds the initial value of the leased property, and (2) the lessee is obligated to become—or has the option of becoming—the owner of the leased property upon termination of the lease for no additional consideration or for nominal consideration. *See* La. R.S. 9:3306(12)(a). In essence, then, a financed lease may be considered a disguised sale in which the "lessor" retains a security interest in the sold property. As the equipment contract calls for the application of New York law, the Leasing defendants assert that the equipment

contract should not be considered a "lease" subject to the LMA.[7] The Court rejects that argument.

The movables are located in Louisiana, and are therefore subject to provisions of the LMA under section 3303(A) of the Act. *See* La. R.S. 9:3303(A). While section 3303(B) of the LMA allowed the parties to select New York's substantive law to govern their agreement, that choice was "[s]ubject to" the provisions of "R.S. 9:3303(D), (E), and (F)." *See* La. R.S. 9:3303(B). Section 3303(F) provides that lessees cannot be bound by agreements in which the lessee consents to the jurisdiction of another state or agreements which fix venue. *See* La. R.S. 9:3303(F). Whether a contract is a "lease" subject to the LMA cannot be determined by New York law because the parties' selection of New York law is "[s]ubject to" the LMA—not the other way around. *See* La. R.S. 9:3303(B). Louisiana's instruction that another state's law cannot trump the prohibition on a forum selection clause in a lease of movables located in Louisiana could hardly be more explicit. *Cf. McKoin Starter & Generator, Inc. v. Snap-On Credit Corp.*, 850 So. 2d 924, 929 (La. App. 2 Cir. 2003), writ denied, 860 So. 2d 1156 (La. 2003).

As explained in *Barnett*, the question is whether enforcement of the forum selection clause is "unreasonable under the circumstances" because it "would contravene a strong public policy of the forum state." *See Barnett*, 831 F.3d at 301.

---

[7] Unlike in New York, financed leases are considered leases in Louisiana. *See* La. R.S. 9:3302. They are subject to the LMA just as any other kind of lease of movables located in this state. *See* La. R.S. 9:3310 (setting forth certain rules applicable only to financed leases).

To answer that question this Court must first ask whether Louisiana public policy is implicated by the contract. Louisiana public policy is implicated here, as the LMA applies to all leases of movables located in this state. *See* La. R.S. 9:3303(A). Accordingly, the Court concludes that the forum selection clause in the equipment contract violates a strong public policy of the forum state, and therefore the clause is unenforceable under federal law. While the Court recognizes that it still has the power to transfer to New York on the basis of the other factors identified in 28 U.S.C. § 1404(a), *see Stewart*, 487 U.S. at 31-32, the Court declines to do so. As explained later in this opinion, the balance of the 1404(a) factors weighs in favor of maintaining the litigation in Louisiana.

2.

The Leasing defendants argue that even if the forum selection clause in the equipment contract cannot be enforced, the Court should transfer the claims against the Leasing defendants to New York pursuant to the forum selection clause in the personal guaranty. The Court disagrees. Even if the forum selection agreement in the personal guaranty is not outright barred by the LMA, the effectiveness of the personal guarantee rises and falls with the equipment contract. To allow the Leasing defendants to use the personal guaranty to achieve a venue transfer which they could not achieve through the equipment contract would circumvent and undermine the public policy goals of the LMA. It would require lessees of movables in Louisiana to litigate their claims in foreign venues, and thus would operate as an end-run around La. R.S. 9:3303(F). The forum selection clause in the personal guaranty is

11

unenforceable under the facts of this case as contrary to Louisiana public policy. *See Barnett*, 831 F.3d at 301.

Further, because the claims related to the equipment contract must remain in this Court, transferring the claims related to the personal guaranty would be problematic for several reasons. For one, it would undermine judicial economy, which retains a "cardinal role" in the section 1404 analysis. *See Rolls Royce*, 775 F.3d at 681. For another, the allegations related to the equipment contract are the same as the allegations related to the personal guaranty, as the plaintiffs claim that both contracts are part and parcel of the same scam. Dividing the litigation would make it difficult for those claims to be effectively considered by any single court. Third, it would make little sense to divide the claims asserted by the small business owners from the claims asserted by the small businesses.

Severance and transfer would, in effect, require similarly situated parties to litigate the same issue in two different forums. Under these circumstances, the Court would decline to order a transfer of the claims against the individual business owners even if the personal guaranty's forum selection clause was enforceable. *See Axis Oilfield Rentals, LLC v. Mining, Rock, Excavation & Const., LLC*, No. 15-1627, 2015 WL 5774801, at *6 (E.D. La. Sept. 30, 2015) (Barbier, J.) (denying motion to sever and transfer pursuant to a valid forum selection clause where "only a portion of the plaintiff's claims are subject to a forum selection clause" and where "severance and transfer would require the same issues to be litigated between the same parties in two cases").

## C.

The Leasing defendants argue as a last resort that if the Court will not transfer the claims against them to New York, the Court should still dismiss the claims as barred by res judicata. The Leasing defendants assert that the plaintiffs' arguments should have been asserted as defenses in the New York collection proceedings, and that the default judgments obtained by the Leasing defendants against the individual plaintiffs bar the untimely assertion of such defenses here.

There is a pending lawsuit against the Leasing defendants jointly filed by the New York Attorney General and the Deputy Chief Administrative Judge for New York City Courts. The lawsuit seeks to vacate over nineteen thousand default judgments obtained by the Leasing defendants against small businesses and their owners on the grounds that the Leasing defendants used the New York court system, lies, and forgery to perpetrate their harassing, fraudulent, and deceptive debt collection practices.

In *Landis v. North American Co.*, the Supreme Court stated that "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." 299 U.S. 248, 254 (1936). Although the Supreme Court decided the *Landis* case in the context of a district court's decision to grant a stay in favor of related federal litigation, *see Landis*, 299 U.S. at 249-53, courts have since invoked the *Landis* decision to grant or deny stays in multiple other contexts, *see Fishman Jackson PLLC v. Israely*, 180 F. Supp. 3d 476, 482 n.3 (N.D. Tex. 2016)

(gathering decisions). "Thus, a district court has a discretionary power to stay proceedings before it in the control of its docket and in the interests of justice," though this control is "not unbounded." *In re Beebe*, 56 F.3d 1384 (5th Cir. 1995) (internal quotation marks omitted). When deciding "whether a stay should be granted, the Court is guided by the factors of judicial economy and convenience for the Court, for counsel, and for the parties." *United States v. FEDCON Joint Venture*, No. 16-13022, 2017 WL 897852, at *1 (E.D. La. Mar. 7, 2017) (Vance, J.) (citing *Landis*, 299 U.S. at 254).

This case presents unique circumstances. In light of the New York litigation, the Court determines that the best course of action is to stay consideration of the individual plaintiffs' claims against the Leasing defendants (and hence the res judicata question) for the present time. The Court will revisit that issue following a final judgment in the New York litigation. As the Court has been advised by defense counsel that motions to dismiss have been pending in that court since January 30, 2017, the delay may not be a lengthy one. Even if the motions are denied and the New York litigation moves forward, however, staying the individual plaintiffs' claims is the most convenient and just manner of proceeding. Doing so avoids imposing undue hardship or inequity on any party and best preserves the "orderly course of justice." *See Israely*, 180 F. Supp. 3d at 482-83 (internal quotation marks omitted). In preparation for the status conference which will soon be scheduled, counsel should consider whether staying the remaining claims against all defendants pending the conclusion of the New York lawsuit would be appropriate.

### III.

The Court next turns to the First Data defendants' request that this litigation be transferred to the Eastern District of New York pursuant to the forum selection clause in the contract for credit card processing services, the "MPAA." As with the equipment contract, most of the briefing focuses on whether the forum selection clause is valid. *See Barnett*, 831 F.3d at 301. But even if it is valid, the Court may nevertheless decline to transfer under section 1404 in certain circumstances. *See Rolls Royce*, 775 F.3d at 678. Because it would result in duplicitous litigation and a waste of judicial resources, the Court declines to order a transfer.

Section 1404 provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any other district or division to which all parties have consented." As previously explained, transferring the claims against the Leasing defendants would be inappropriate. The decision faced by the Court is therefore whether to sever and transfer the claims against the First Data defendants (and possibly Payment Systems) while retaining the other claims here. As the Fifth Circuit has recognized, whether to sever and transfer is "necessarily a fact-sensitive analysis." *See Rolls Royce*, 775 F.3d at 681. The twin drivers of the inquiry are the interests of the litigants and the interests of the public at large. *Id.*

If the parties have signed a valid forum selection clause, the private interest factors favor severance and transfer as a matter of law. *Id.* at 678. As previously

15

explained, the validity of the forum selection clause in the MPAA is disputed by the parties. Even assuming that the clause is enforceable, however, and that the private interest factors weigh in favor of severance and transfer, the Court would still refuse to divide this litigation under section 1404 on the basis of the relevant public interest factors.

The Fifth Circuit recognizes "that the need—rooted in the valued public interest in judicial economy—to pursue the same claims in a single action in a single court can trump a forum-selection clause." *Rolls Royce Corp.*, 775 F.3d at 679. "While judicial economy is not the sole consideration for a district court facing a severance-and-transfer motion, it retains a cardinal role." *See Rolls Royce*, 775 F.3d at 681. There are several reasons why the public's interest in maintaining all of the claims in a single lawsuit is especially strong in this case.

First, the interest in judicial economy must be considered especially strong where severance and transfer would require "the same issues to be litigated between the same parties in two cases." *See Axis*, 2015 WL 5774801, at *6. As the similarity of the divided litigation increases, so must the public's interest against creating such duplicitous litigation. In this case, the plaintiffs do more than assert related claims against related defendants. They allege that the several defendants collectively formed a single fraudulent enterprise, the purpose of which was to work together to defraud small businesses. *See* R. Doc. No. 4, at 7 ¶ 23. Because the claims against the defendants are identical, dividing this litigation would create two identical federal lawsuits. The public interest in avoiding that result is a strong one.

Second, the nature of the allegations are such that the claims against each of the defendants are inextricably intertwined.  Although there are several contracts at issue, the plaintiffs allege that the defendants coordinated the use of those contracts to perpetuate a fraudulent scheme.  Dividing the litigation and the defendants would make it difficult for a court to evaluate the merits of the allegations against any single defendant.  Thus severance and transfer would work unusual difficulties here, not only creating two lawsuits but also making it more difficult for either court to resolve the claims before it.

Third, the "local interest in having localized controversies decided at home" weighs in favor of maintaining the litigation here.  *See Atl. Marine*, 134 S. Ct. at 581 n.6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, n. 6 (1981)).  The plaintiffs filed this lawsuit as a purported class action pursuant to the Class Action Fairness Act ("CAFA").  While CAFA does not of its own force preempt enforcement of a valid forum selection clause, *see Mendoza v. Microsoft, Inc.*, 1 F. Supp. 3d 533, 550-51 (W.D. Tex. 2014), there is nothing to prevent this Court from considering the localized nature of the purported class when deciding whether a section 1404 transfer is appropriate.  The amended complaint defines the class as:

> All Louisiana persons (including natural persons, corporations, partnerships or other legal entities) who applied or contracted for merchant card services and/or related equipment leasing with any of the Defendants and/or signed personal guarantees for such contracts and leases.

R. Doc. No. 4, at 29 ¶ 118.  The defendants are incorporated and have their principal places of business in various states, including New York, Georgia, California, and Delaware.  The putative class plaintiffs are Louisiana residents and Louisiana

businesses. The alleged harm occurred in Louisiana, where the businesses and credit card swiping machines are located and where the effects of the alleged fraud and predatory debt collection practices manifested. The local nature of the allegations described in the complaint is an additional public interest factor which favors maintaining this dispute in Louisiana.

The Court recognizes the Supreme Court and Fifth Circuit's clear instruction that, in all but unusual cases, the interest in judicial economy is insufficient to deny effect to a valid forum selection clause. Indeed, in another recent case, this Court severed and transferred the plaintiffs' claims against one of the defendants notwithstanding the Court's recognition that doing so would create parallel actions and, to some degree, waste judicial resources. The Court reasoned that, "while there are certainly difficulties associated with the transfer, they are the run-of-the-mill difficulties which will always exist in such scenarios." *Royal Smit Transformers BV v. HC BEA-LUNA M/V*, No. 16-14647, 2017 WL 819243, at *5 (E.D. La. Mar. 2, 2017) (Africk, J.). But this case is special. The difficulties associated with severance and transfer here are not the run-of-the-mill difficulties created by multi-party litigation. As such, the Court finds that the emphasis placed on judicial economy, combined with the unique and interrelated nature of the allegations in the complaint, requires denying the First Data defendants' motion. *See Axis*, 2015 WL 5774801, at *6.

## IV.

For the foregoing reasons,

**IT IS ORDERED** that the Leasing defendants' motion to transfer venue is **DENIED**, but that the Leasing defendants' motion to dismiss based on res judicata is **DISMISSED WITHOUT PREJUDICE**. It may be re-filed following the conclusion of the New York litigation.

**IT IS FURTHER ORDERED** that the individual plaintiffs' claims against the Leasing defendants are **STAYED** pending a final decision by the lower court in the New York litigation. Either party may file a written motion to re-open the claims with **thirty days** of a final decision by the lower court in the New York action.

**IT IS FURTHER ORDERED** that the First Data defendants' motion to transfer venue is **DENIED.**

New Orleans, Louisiana, May 8, 2017.

_____
**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**